IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br>v.<br><br>DAMON O'NEIL,<br><br>    Defendant. | Criminal No. 3:11-cr-0017-RP<br><br><br>DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF COMPASSIONATE RELEASE |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 2

PROCEDURAL BACKGROUND................................................................................... 2

ARGUMENT FOR A § 3582(c)(1)(A)(i) REDUCTION.................................................. 5

    I. The Court has jurisdiction to consider Mr. O'Neil's motion to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A), because 30 days have passed since his request for relief from the Warden. .................................................................................... 5

    II. Extraordinary and compelling circumstances justify a reduction in Mr. O'Neil's sentence. ............................................................................................................ 7

    III. The § 3553(a) factors justify a sentence reduction to time served. ........................ 15

CONCLUSION............................................................................................................... 16

## INTRODUCTION

Damon O'Neil is about three-and-a-half years from discharging the 15-year sentence imposed by this Court. With the ongoing COVID-19 pandemic, and Mr. O'Neil's chronic medical conditions, the Court should reconsider Mr. O'Neil's sentence under 18 U.S.C. § 3582(c)(1)(A)(i). The COVID-19 outbreak with Mr. O'Neil's medical conditions, and the short-time left on his sentence with the other circumstances of this case, provide an extraordinary and compelling reason for a compassionate reduction in Mr. O'Neil's sentence under § 3582(c)(1)(A)(i) to time served.

Mr. O'Neil, through counsel, submits this brief to address anticipated arguments that Mr. O'Neil has not "exhausted" under 18 U.S.C. § 3582(c)(1)(A), and that the Court therefore lacks jurisdiction to consider his motion. Section 3582(c)(1)(A) permits a court to consider a motion for compassionate release after the earliest of either (1) exhaustion of all BOP remedies or (2) the passing of 30 days from submission of a request to the Warden at the defendant's facility. Here, more than 30 days have passed. Mr. O'Neil's motion is ready for consideration. Defendant also submits this brief to supplement his arguments on the merits for compassionate release.

The Court should reduce Mr. O'Neil's sentence to time served – which would be the equivalent of, with credit for good time, a sentence of about 11 years.

## PROCEDURAL BACKGROUND

On January 6, 2012, Mr. O'Neil was found guilty by a jury of engaging in a conspiracy to distribute at least 28 grams of cocaine base in violation of 21 U.S.C. § 841(b)(1)(B). [Dkt. No. 69.] On May 10, 2012, this Court sentenced Mr. O'Neil to life imprisonment, after making a finding by the preponderance of the evidence that Mr. O'Neil conspired to distribute over 280 grams of cocaine base. [Dkt. No. 69; Dkt. No. 113 at 7:09–13.] After an appeal to the Supreme

Court, and after the Eighth Circuit's reversal with remand for resentencing following *Alleyne*, this Court sentenced Mr. O'Neil, on August 20, 2014, to 180 months. [Dkt. No. 144.] The Court found that Mr. O'Neil was a career offender and that his mandatory minimum was 10 years based on a § 851 notice. [*See* Dkt. No. 146; Dkt. No. 152.]

In 2016, Mr. O'Neil filed pro se motions seeking a reduction in his sentence. [Dkt. Nos. 158, 159.] The Court denied these motions. [Dkt. No. 161.]

On March 25, 2019, Mr. O'Neil filed a pro se motion to reduce his sentence under the First Step Act. [Dkt. No. 164.] Mr. O'Neil first argued that his prior convictions did not qualify as serious drug felonies following the First Step Act and, if he were sentenced today, these prior convictions could not be used to enhance his mandatory minimum. The Court recognized that Mr. O'Neil "may be correct that he would have faced different sentencing consequences under section 401 of the First Step Act," but that the change "was not made retroactive for defendants sentenced before the enactment of the First Step Act in 2018." [Dkt. No. 165.] Second, Mr. O'Neil argued that a reduction was appropriate under section 404 of the First Step Act, which made retroactive the changes to the mandatory minimums for cocaine base offenses that were implemented in the Fair Sentencing Act of 2010. But the Court noted that Mr. O'Neil was sentenced after 2010, and Defendant's sentence took that Act into account. [Dkt. No. 165.] The Court denied Mr. O'Neil's motion for reduction of his sentence under the First Step Act. [Dkt. No. 165.] On February 6, 2020, Mr. O'Neil filed a motion for reconsideration of this Order, [*see* Dkt. No. 167], which this Court stayed pending resolution of Court of Appeals Docket #19-1422.

On March 30, 2020, Mr. O'Neil made a request for compassionate release to his case manager (as he had been instructed). [Dkt. No. 169 at p.23.] He requested home confinement based on the CARES Act because he was a high risk inmate "with chronic asthma, acute

3

bronchitis, and a breathing machine (CPAP)." [Dkt. No. 169 at p.23.] On April 10, 2020, he received a response that denied his request. [Dkt. No. 169 at p.22.] The denial indicates that Mr. O'Neil met eight of the nine criteria for release to home confinement. [Dkt. No. 169 at p.22.] His primary offense was a non-violent offense, he had no detainer, BRAVO score was low or minimum, he had served at least 50% of his sentence, and he had no incident reports in the past twelve months. [Dkt. No. 169 at p.22.] But because his PATTERN risk score was Medium, his request was denied. [Dkt. No. 169 at p.22.]

On April 13, 2020, Mr. O'Neil submitted the request to the Warden of Allenwood. [Dkt. No. 169 at pp. 12–21.] That request was made, as his lengthy submission notes, under the CARES Act of 2020 and under the First Step Act, 18 U.S.C. § 3582(c)(1)(A). [Dkt. No. 169 at p.13.] Mr. O'Neil was informed on April 14, 2020 that, because "[t]he Pattern score criteria has not changed," and he has a Medium risk score, he was "not eligible" for compassionate release. [Dkt. No. 169 at p.12.]

On April 27, 2020, Mr. O'Neil filed a pro se motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). To his pro se motion, Mr. O'Neil attached correspondence between him and Allenwood staff regarding his request for compassionate release. In his pro se motion, Mr. O'Neil reported that the staff at Allenwood had told him that "nobody here at Allenwood is getting approved" for compassionate release through a request to the Warden and that "if you're not d[ying] you['re] not going anywhere." [Dkt. No. 169 at p.2.] He noted that correctional officers at Allenwood's facilities in Pennsylvania had reportedly tested positive for COVID-19, but as of yet no inmates had tested positive for the virus. [Dkt. No. 169 at p.3.] His understanding was also that, if someone was believed to contract COVID-19, the individual is placed in the "SHU" (the special housing unit for isolation of inmates, usually used to punish

4

inmates for misconduct). [Dkt. No. 169 at p.3.] Mr. O'Neil argued that "social distancing is impossible [in Allenwood] due to the open style bar[r]ack housing and no closed door environment . . . , every inmate here is within 4 to 6 feet of each other with no way to cut off social contact." [Dkt. No. 169 at p.5.] Because they are "packed in closed quarters on quarantine, eating and showering" in close proximity, the "prison is a petri dish for COVID-19 virus." [Dkt. No. 169 at pp.5–6.]

## ARGUMENT FOR A § 3582(c)(1)(A)(i) REDUCTION

**I. The Court has jurisdiction to consider Mr. O'Neil's motion to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A), because 30 days have passed since his request for relief from the Warden.**

Section 3582(c)(1)(A) states that a court may consider a defendant's motion for compassionate release under (c)(1)(A)(i) "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  The statute "requires the defendant either to exhaust administrative remedies or simply to wait 30 days after serving his petition on the warden of his facility before filing a motion in court." *United States v. Haney*, No. 19-cr-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020); *see also United States v. Morgan*, No. 4:92-cr-4013, Doc. No. 2337, at *5–6 (N.D. Fla. Apr. 27, 2020) (considering motion because the defendant had waited more than 30 days). The plain text of the statute creates two alternative conditions: either exhaustion of BOP remedies or the passing of 30 days.  The words "after" and "whichever is earlier" indicate two alternative clocks started by the submission to the warden.  After the earliest of those the Court

has jurisdiction for a motion.[1]  "By providing a 30-day lapse period, Congress specifically contemplated situations—such as the present pandemic—wherein BOP would be unable to manage all urgent and potentially meritorious requests for release." *United States v. Amarrah*, 2020 WL 2220008, at *5 (E.D. Mich. May 7, 2020).

While Defendant anticipates the government may take a contrary position here, the government elsewhere, in a number of cases, has recognized that the 30-day waiting period is independent of the exhaustion of administrative remedies. *See, e.g.*, Gov't Resp. to Def.'s Mot. for Compassionate Release, *United States v. Kriglstein*, No. 16-cr-00663 JCH (D.N.M. Apr. 11, 2020), Dkt. No. 48 ("As an initial matter, it appears that the defendant has exhausted his administrative remedies as require[d] by statute as more than 30 days have lapsed since the warden of FCI Terminal Island received the defendant's request.");  Gov't Resp. to Mot. for Compassionate Release, *United States v. Jenkins*, No. 1:99-cr-00439-JLK-1 (D. Colo. Apr. 27, 2020), Dkt. No. 478 (arguing § 3582(c) "requires for a sentence reduction be presented first to BOP for its consideration; only after 30 days have passed, or the defendant has exhausted all administrative rights to appeal the BOP's failure to move on the defendant's behalf, may a defendant move for a sentence reduction in court"); Gov't Opp. To Def.'s Mot. for Compassionate Release, *United States v. Carter*, No. 16-cr-156 (TSC) (D.D.C. May 4, 2020), Dkt. No. 34 ("Although we use the term 'exhaustion requirement,' to be clear, an inmate need not 'exhaust'

---

[1] Notably, the statute does not say that the 30-day period applies *only if* nothing is heard from the warden subsequent to submission of the request for compassionate release.  If that were the intention, Congress could easily have drafted the statute to say that a defendant may file a motion under § 3582(c)(1)(A)(i), and a court may consider it, if the Warden does not *respond* in 30 days to the request.  But that is not what the statute says.  It states that a court can consider a motion after 30 days from *service* to the warden, if that passes earlier than the exhaustion of any BOP remedies.  Interpreting the statute to say anything else would effectively read the phrase "whichever is earliest" out of the statute.

administrative remedies if the motion is filed in court 30 days after receipt of a request by the warden.").

Here, Mr. O'Neil submitted his request for compassionate release at LCSI Allenwood Low on about March 30, 2020. [Dkt. No. 169 at p.23.] He requested that the Warden place him on home confinement at that time. On April 13, 2020, he resubmitted that request to the Warden, clarifying that he was seeking release under the CARES Act or compassionate release under 3582(c)(1)(A). [Dkt. No. 169 at p.12.] At least, by May 13, 2020, the date of this brief,[2] the thirty-day period has passed. Even if the BOP is currently implementing internal processes to determine which detainees are, in its view, candidates for compassionate release, the Court need not wait for the BOP's wheels to turn. The Court may consider Mr. O'Neil's motion.

## II.   Extraordinary and compelling circumstances justify a reduction in Mr. O'Neil's sentence.

To grant a compassionate release motion, the Court must find "extraordinary and compelling" circumstances. Congress has never defined what constitutes "extraordinary and compelling." Instead, it delegated that to the Sentencing Commission. *See* 28 U.S.C. § 994(t). The Commission's recommendation appears in commentary to USSG § 1B1.13 (the actual policy statement just repeats the statutory language), noting that "extraordinary and compelling reasons" may include medical conditions, age, family circumstances, and other reasons. *Id.* at app. n.1. The

---

[2] Mr. O'Neil filed his pro se motion for compassionate release on April 27, 2020. While that filing may have been before the running of 30 days from when his request was submitted to the Warden, that is of no consequence. Section 3582(c)(1)(A) states that "the court, . . . upon motion of the defendant . . . [after] the lapse of 30 days . . . may reduce the term of imprisonment." Nothing in the language of 3582(c)(1)(A) prohibits a defendant from filing a motion for compassionate release before the 30-day period has passed, and then the Court considering and granting relief after the 30-day period has passed. But if the Court does conclude that it can only consider motions *filed* by defendant after the 30-day period has passed, counsel requests that the Court consider this brief as a submitted motion, or grand counsel leave to file a motion on the defendant's behalf.

Commentary does not limit "other reasons," but says that it could be any "extraordinary and compelling reason other than, or in combination with" medical conditions, age, or family circumstances. *Id.* The Commission's statement was, however, formulated before the First Step Act passed, and since then it has not met to redefine or clarify what "extraordinary and compelling" might mean. *United States v. Brown*, 411 F. Supp. 3d 446, 449 n.1 (S.D. Iowa Oct. 8, 2019).

Looking at the Commission's earlier statements, courts have regarded them as helpful but anachronistic: "the scope of the old policy statement is clearly outdated and, at the very least, does not apply to the entire field of post-First Step Act motions . . . . Therefore, the policy statement may provide 'helpful guidance' but does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *United States v. Rodriguez,* No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020); *see United States v. Fox*, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("I agree with the courts that have said that the Commission's existing policy statement provides helpful guidance [but] is not ultimately conclusive given the statutory change."). Thus, courts have found that they do not have to sit on their hands in situations like these and wait for the Commission to provide greater guidance. Instead, because the "statute's text directly instructs *courts* to 'find that' extraordinary circumstances exist," the court may determine what falls within those statutory terms. *Rodriguez,* 2020 WL 1627331, at *6 (emphasis in original); *see also United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *7 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment"); *United States v. Lisi*, No. 15 CR. 457 (KPF), 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020).

That is to say, this Court makes the call on what qualifies while defining the terms

"extraordinary and compelling" based on their ordinary and accepted meaning. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). *Black's Law Dictionary* defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common." *Black's Law Dictionary* (defining Extraordinary) (11th ed. 2019). It defines "compelling need" as a "need so great that irreparable harm or injustice would result if it is not met." *Black's Law Dictionary* (defining Compelling Need) (11th ed. 2019). Taken together, they constitute the standard this Court should apply: the reason must be "beyond what is usual, customary, regular, or common," and the reasons must be "so great that irreparable harm or injustice would result if the relief is not granted." *See United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *5 (S.D. Tex. June 17, 2019) (applying this approach with an older dictionary); *Beck,* 2019 WL 2716505, at *8 (same).

Like other general terms, the words "extraordinary" and "compelling" find meaning by both the statute's text and the facts that *other* cases have found to be extraordinary and compelling. In recent weeks, in the time of the COVID-19 pandemic, the list of what is "extraordinary and compelling" has been enumerated by dozens of courts. For example, a district court in the Eastern District of Washington found that the defendant's age and health combined with the fact that "it is impossible to practice social distancing or isolation in a jail setting" comprised extraordinary and compelling reason for compassionate release. *United States v. Gonzalez*, No. 2:18-cr-232-TOR, R. 834 (E.D. Wash. Mar. 31, 2020) (releasing defendant one month into a 10 month sentence in light of medical issues; ordinarily these conditions would be manageable but "these are not ordinary times"). In another, the risk to a defendant with diabetes from contracting COVID-19, with the recognition that "the COVID-19 pandemic will continue to grow and spread over the next several weeks," led the district court in the District of Connecticut to conclude "that the risks faced

by Defendant will be minimized by her immediate release to home." *United States v. Colvin,* 19-cr-179 R.38 (D. Conn April 2, 2020). District courts have reassessed the sentences given just a few years prior because that sentence did not anticipate a pandemic. *See United States v. Edwards*, No. 6:17-cr-3-NKM, R. 134 (Apr. 2, 2020) (granting compassionate release; "[h]ad the Court known when it sentenced Defendant in 2018 that the final 18 months of his term in federal prison would expose him to a heightened and substantial risk presented by the COVID-19 pandemic on account of Defendant's compromised immune system, the Court would not have sentenced him to the latter 18 months"). District courts have addressed the reasonableness of requiring a defendant to serve a few more months at the risk of severe health consequence. *Perez*, 2020 WL 1546422 (granting compassionate release where "[t]he benefits of keeping [Perez] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave"). While others have collected many dozen recent cases granting compassionate release,[3] the take-away is that the COVID-19 pandemic creates an extraordinary and compelling reason for home confinement for those at greatest risk of death from COVID-19.

While Defendant anticipates that the government will argue that the situation within the BOP is no more perilous than it is among the public, the data refutes this contention. As of May 11, 2020, the BOP is reporting that 3,379 federal inmates currently have confirmed positive tests for COVID-19.[4] This number does not include the 656 federal inmates that the BOP reports as

---

[3] Sentencing Law and Policy, *Another robust week for COVID-influenced federal sentence reductions using § 3582(c)(1)(A)* (May 8, 2020), *at* https://sentencing.typepad.com/sentencing_law_and_policy/2020/05/another-robust-week-for-covid-influenced-federal-sentence-reductions-using-3582c1a.html.

[4] Federal Bureau of Prisons, COVID-19, *at* https://www.bop.gov/coronavirus/ (last visited May 12, 2020).

having recovered.  It also does not include the 49 federal inmates who have died from COVID-19 while in custody.[5]

Looking at the last month, the growth of confirmed cases within the BOP has been dramatic.  A couple charts prove this point.  First is a chart of the growth in reported COVID-19 cases over the period from April 6, 2020, to May 7, 2020.  The chart shows a steady, unabated increase in the 31-day period.



Second is a chart that compares the growth of COVID-19 cases within the BOP against the number of cases among the United States population.  Since the BOP's first reported infection, there has been a disproportionately high growth rate for COVID-19 cases in the BOP.

---

[5] *Id.*



The government may try to argue that Defendant (like any person) would still be at risk on the outside, but that argument overlooks the heightened risk to him on the inside. While COVID-19 is deadly wherever one encounters it, the risks of contracting it are significantly higher in the custody of the BOP. This is due in part to the fact that, as Mr. O'Neil's pro se motion argued, inmates are unable to socially distance while in custody and unable to protect themselves from the virus. The ability to quarantine or socially distance oneself from others cannot happen in prison. Indeed, the CDC's website seemingly recognizes this when it says, in response to the question "Do I have a greater chance of getting COVID-19?": "People in correctional and detention facilities are at greater risk for illnesses, such as COVID-19 because of their close living arrangements with other people."[6] Or, as one district judge has put it, in the

---

[6] CDC, *FAQs for administrators, staff, people who are incarcerated, families* (updated Apr. 10, 2020), *at* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html.

context of granting a motion for compassionate release, prisons are "tinderboxes for infectious disease." *United States v. Rodriguez*, No. 2:03-cr-271-AB, Dkt. No. 135 (E.D. Pa. Apr. 1, 2020).

But the higher risks to Mr. O'Neil while in custody are also due to the fact that the BOP appears ill-equipped or unprepared for this pandemic. Take the allegations made by the union for BOP's employees, which reports that the BOP failed to initiate a lock down of inmates fast enough to limit the spread of COVID-19, unnecessarily exposing BOP staff to COVID-19.[7] The grievance reports that the BOP also "ordered staff who have knowingly been exposed to the COVID 19 Virus to report to work without the required 14-day quarantine time recommended by the CDC . . . and without requiring/issuing proper PPE increasing the risk of further exposure, illness and possible death to other staff and communities."[8] A review at one BOP facility (MDC Brooklyn) found that it was "ill-equipped to identify cases of COVID-19," not implementing "adequate infection control practices," and in a way were "actually promot[ing] a more rapid spread of COVID-19 inside the facility and served to work against some of the infection control measures already in place."[9] (This is at a facility, which is in the heart of the city with the nation's most significant outbreak, where the BOP is currently reporting that there are no positive COVID-19 cases.[10]) The rates of infection at some BOP facilities are staggering. At Lompoc FCI, over three-fourths, 891 of the 1,162 inmates, are reported to have tested positive

---

[7] Formal Grievance, BOP, filed by Council of Prison Locals (CPL) C-33, April 16, 2020, *at* https://cdn.govexec.com/media/gbc/docs/pdfs_edit/042020cb1.pdf.
[8] *Id.*
[9] Facility Evaluation: MDC COVID-19 Response, *Chunn et al. v. Edge*, No. 1:20-cr-10590-RPK-RLM (E.D.N.Y. Apr. 30, 2020), Dkt. No. 72-1.
[10] Federal Bureau of Prisons, COVID-19, *at* https://www.bop.gov/coronavirus/ (last visited May 9, 2020) (reporting no active, open cases of COVID-19 among the inmate population).

for COVID-19.[11]  At Terminal Island FCI, 66.5% of the 1,042 inmates are reported to have tested positive.[12]

At Allenwood Low, as of May 12, 2020, the BOP currently reports no positive cases for COVID-19 among the inmate population.  The Allenwood facilities have previously reported positive cases among staff and inmates at the Allenwood facilities, including the USP and Medium FCI.  Even though, it is nearly inevitable that COVID-19 will invade Allenwood Low's walls like it has for the many other BOP facilities.  And when it does, the conditions in Allenwood – which include housing of three people in close proximity in "cubes" lined up in an open dorm environment with 160 inmates per dorm – will inevitably promote the rapid spread of the virus among the inmate population.

Mr. O'Neil's medical conditions make him at heightened risk of serious adverse health consequences, and even death, if he were to contract COVID-19.  The medical records attached to Mr. O'Neil's brief indicate that he has asthma, hypothyroidism, prediabetes, and sleep apnea. He also uses a CPAP machine.  As COVID-19 is a respiratory disease, his asthma is particularly concerning.  Many courts have recognized that compassionate release may be appropriate for those with asthma.[13]

---

[11] *Compare* Federal Bureau of Prisons, COVID-19, *at* https://www.bop.gov/coronavirus/ (last visited May 12, 2020), *with* Federal Bureau of Prisons, Population Statistics, *at* https://www.bop.gov/mobile/about/population_statistics.jsp (last visited May 9, 2020).
[12] *Compare* Federal Bureau of Prisons, COVID-19, *at* https://www.bop.gov/coronavirus/ (last visited May 12, 2020), *with* Federal Bureau of Prisons, Population Statistics, *at* https://www.bop.gov/mobile/about/population_statistics.jsp (last visited May 9, 2020).
[13] *See, e.g.*, *United States v. Williams*, 3:17-CR-121-(VAB)-1, 2020 WL 1974372 (D. Conn. Apr. 24, 2020) (granting compassionate release to a defendant with asthma, hypertension, a history of kidney issues, and other medical conditions); *United States v. Gorai*, 2:18-cr-00220-JCM-CWH-1, 2020 WL 1975372 (D. Nev. Apr. 24, 2020) (granting compassionate release to a 34-year-old defendant with asthma as the only listed medical condition); *United States v. Park*, 16-cr-473 (RA), 2020 WL 1970603 (S.D. N.Y. Apr. 24, 2020) (granting compassionate release to a 44-year-old defendant with asthma); *United States v. Tillman*, 1:07-cr-00197-PLM-1, 2020 WL

**III.    The § 3553(a) factors justify a sentence reduction to time served.**

Mr. O'Neil has already evaluated, in his pro se motion [Dkt. No. 169], the § 3553(a) factors that justify a reduction in his sentence to time served.[14] He is a non-violent inmate. He has served time in custody since January 24, 2011 to date – or about 72.6% of the sentence with credit for good time. He is projected to have satisfied his sentence on November 4, 2023. But his anticipated release to a halfway house is at the end of 2022. He has been incident-free since the end of 2018, and any of his prior incidents were for minor offenses. While incarcerated, he has completed numerous programs[15] and maintained steady prison employment. He has worked in UNICOR and as a suicide watcher for suicidal inmates. While the BOP reports that Mr. O'Neil's PATTERN score is Medium, he is housed at a low security facility with a low or medium BRAVO score. In days, Mr. O'Neil will be eligible for a minimum security facility.

---

1950835 (W.D. Mich. Apr. 23, 2020) (granting compassionate release to a defendant with asthma and diabetes); *United States v. Gileno*, 3:19-cr-161-(VAB)-1, 2020 WL 1904666 (D. Conn. Apr. 17, 2020); *United States v. Samy*, 2:16-cr-20610-AJT-DRG-1, 2020 WL 1888842 (E.D. Mich. Apr. 16, 2020); *United States v. Ben-Yhwh*, CR 15-00830 LEK, 2020 WL 1874125 (D. Haw. Apr. 13, 2020); *United States v. Smith*, 1:12-cr-00133-JFK-1, 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020); *United States v. Wen*, 6:17-CR-06173 EAW, 2020 WL 1845104 (W.D. N.Y. Apr. 13, 2020); *United States v. Tran*, 8:08-cr-00197-DOC-1, 2020 WL 1820520 (C.D. Cal. Apr. 10, 2020); *United States v. Burrill*, 17-CR-00491-RS-2, 2020 WL 1846788 (N.D. Cal. Apr. 10, 2020); *United States v. McCarthy*, 3:17-cr-00230-JCH-1, 2020 WL 1698732 (D. Conn. Apr. 8, 2020); *United States v. Hernandez*, 1:18-cr-00834-PAE-4, 2020 WL 1684062 (S.D. N.Y. Apr. 2, 2020); *United States v. Powell*, No. 1:94-cr-316-ESH, 2020 WL 1698194 (D.D.C. Mar. 28, 2020).

[14] At the time of this filing, counsel has requested various reports and medical records from the BOP, and he is awaiting receipt of these reports. Counsel would request the opportunity to supplement this brief with additional records at a future date, if the Court has questions about the programing or medical conditions of Mr. O'Neil.

[15] Mr. O'Neil's SENTRY report indicates that he has participated in a variety of educational programming, including, among others, in the past few years basic house construction, brick walls class, single man gourmet, crochet, HVAC-refrigeration, serve safe food manager, starting your own business, beading for beginners, introduction to financial security, parenting, home ownership, and beginning leather craft.

Mr. O'Neil also has an appropriate release plan. He could stay with his grandmother in Chicago, Illinois, or with his fiancé in DeWitt, Iowa. Counsel can provide additional information about his proposed release plans to the Court or the U.S. Probation Office.

Considering all the § 3553(a) factors, with Mr. O'Neil's performance while he has been incarcerated, a sentence of time served – the equivalent of about 11 years with credit for good time – would be sufficient but not greater than necessary.

## **CONCLUSION**

Under 18 U.S.C. § 3582(c)(1)(A)(i), the Court should resentence Mr. O'Neil to time served.

Respectfully submitted,

  */s/  Andrew Graeve*
Andrew Graeve
FEDERAL PUBLIC DEFENDER'S OFFICE
400 Locust Street, Suite 340
Des Moines, Iowa 50309-2353
PHONE: (515) 309-9610
FAX: (515) 309-9625
andrew_graeve@fd.org
ATTORNEY FOR DEFENDANT

CERTIFICATE OF SERVICE
I hereby certify that on May 13, 2020, I electronically filed this document with the Clerk of Court using the ECF system, which will serve all parties.

  /s/  Theresa McClure