IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | 3:11-CR-00017 |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| DAMON O'NEIL, | * | ORDER GRANTING |
| | * | COMPASSIONATE RELEASE |
| Defendant. | * | |
| | * | |

Before the Court is Defendant Damon O'Neil's pro se Motion for Compassionate Release filed on April 27, 2020.  ECF No. 169.  Per the Southern District of Iowa's Administrative Order No. 20-AO-9-P, the Federal Public Defender (FPD) filed a supplemental brief in support of release on May 13.  ECF No. 172.  The Government filed its resistance on May 26.  ECF No. 173.  The FPD replied on Defendant's behalf under seal on June 2.  ECF No. 176.  The matter is fully submitted.

## I.  BACKGROUND

According to the U.S. Probation and Pretrial Services Office (USPO), Defendant's childhood Chicago neighborhood "was plagued with gangs, drugs, and violence."  ECF No. 146 ¶ 66.  His father was absent, and his mother, who battled drug addiction, was often so as well.  *Id.*  By age ten Defendant had affiliated with a gang[1], *id.*, by age eleven he was introduced to marijuana through friends and family members, *id.* ¶ 82, and by age twenty-one he was serving his first term of incarceration, *id.* ¶ 34.  In 1997 and 2000, Defendant picked up state convictions based on his possessing or delivering less than a gram of cocaine.  *Id.* ¶¶ 36, 38; *see also* ECF No. 44.

---

[1] Defendant ended this affiliation by age twenty-one.  ECF No. 169 ¶ 66.

In 2010, Defendant moved to Davenport, Iowa.  ECF No. 146 ¶ 77.  In 2012, a jury in the Southern District of Iowa convicted Defendant of conspiracy to distribute twenty-eight grams or more, but less than 280 grams, of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846.  ECF No. 69.  The Government filed a notice of enhancement under 21 U.S.C. § 851, identifying the cocaine possession and delivery convictions mentioned above. ECF No. 44.  The Court ultimately sentenced Defendant to 180 months' imprisonment and eight years of supervised release.[2]  ECF Nos. 145–46.

Nearly a decade later, the virus known as COVID-19 has killed more than 104,000 Americans and infected more than 1.7 million in a few months.  *Mortality Analysis*, Johns Hopkins U. & Med. (May 31, 2020, 11:45 PM), https://coronavirus.jhu.edu/data/mortality.  "At this time, there is no known cure, no effective treatment, and no vaccine.  Because people may be infected but asymptomatic, they may unwittingly infect others."  *S. Bay United Pentecostal Church v. Newsom*, No. 19A1044, 2020 WL 2813056, at *1 (U.S. May 29, 2020) (Roberts, C.J., concurring).

We have limited access to courts, schools, churches, theaters, and "non-essential" businesses—places where there are too many people and too little space to keep the virus from spreading.  That also sounds a lot like federal prison.  Already "tinderboxes for infectious disease," prisons now are even more dangerous than we typically accept.  *United States v.*

---

[2] On May 10, 2012, the Court sentenced Defendant to life in prison, finding by a preponderance of the evidence that he was responsible for 2.5 kilograms of crack cocaine, triggering a mandatory life sentence because of Defendant's prior felony convictions.  ECF No. 106.  Defendant appealed, and the Eighth Circuit initially affirmed. *See United States v. O'Neil*, 496 F. App'x 694 (8th Cir. 2013). Defendant petitioned for a writ of certiorari, and the Supreme Court granted certiorari, vacated the Eighth Circuit's opinion, and remanded to the Eighth Circuit for further consideration following *Alleyne v. United States*, 570 U.S. 99 (2013).  *O'Neil v. United States*, 571 U.S. 801 (2013).  In response, the Eighth Circuit vacated Defendant's sentence and remanded to the district court for resentencing following *Alleyne*, which prevented the Court from enhancing Defendant's mandatory minimum sentence beyond that supported by the jury's verdict. *See United States v. O'Neil*, 549 F. App'x 595 (8th Cir. 2014).

*Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020).  At

least 1629 prisoners and 177 Federal Bureau of Prisons (BOP) staff have "open" and

"confirmed" cases of the virus.  *COVID-19 Cases*, Fed. Bureau Prisons (May 31, 2020),

https://www.bop.gov/coronavirus/.  Sixty-seven inmates have died.  *Id.*

But it is hard to compare these numbers to those for the nation at large.  First, the BOP

case count fluctuates both up and down because it only includes "open" cases.  *See COVID-19*

*Cases*, Fed. Bureau Prisons (May 21, 2020), https://www.bop.gov/coronavirus/ (noting BOP

"positive test numbers are based on the most recently available *confirmed lab results* involving

*open cases*"); Christian Boone, *Employee's Death Raises Questions About Conditions Inside*

*Federal Pen*, Atlanta J. Const. (May 4, 2020), https://www.ajc.com/news/local/employee-death-

raises-questions-about-conditions-inside-federal-pen/3Enh61w6Di8rcT9YuY5PPK/ (quoting

BOP spokesperson as saying "[t]he total number of open, positive test, COVID-19 cases

fluctuates up and down").  And second, it remains unclear how likely BOP is to test an inmate at

all.  *See BOP Expands COVID-19 Testing: Rapid Testing Available at Select Facilities*, Fed.

Bureau Prisons (April 24, 2020, 1:00 PM),

https://www.bop.gov/resources/news/20200424_expanded_testing.jsp (describing testing of

asymptomatic patients at "select facilities").  Under this case-counting framework, there does not

appear to be any "open" and "confirmed" cases at Defendant's prison, FCI Allenwood Low.[3]

The BOP indeed faces a daunting task.  It has undertaken emergency measures to halt the

virus's spread.  *BOP Implementing Modified Operations*, Fed. Bureau Prisons,

https://www.bop.gov/coronavirus/covid19_status.jsp (last visited June 1, 2020).  Social visits are

cancelled, prisoner movement is limited, and legal visits are suspended subject to exception.  *Id.*

---

[3] A staff member at the nearby Allenwood Medium prison had a confirmed case but has since
recovered.  *COVID-19 Cases*, Fed. Bureau Prisons (May 31, 2020), https://www.bop.gov/coronavirus/.

At the same turn, it is unclear what the future holds as states relax restrictions on free residents, including BOP employees.

On April 13, 2020, Defendant petitioned his Warden for home confinement under the BOP's COVID-19 home confinement program or, in the alternative, compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).  ECF No. 169 at 12.  He argued his chronic asthma, bronchitis, and use of a "breathing machine"[4] made it more likely he would suffer severe consequences if infected with COVID-19.  *Id.*  The Warden wrote back that Defendant was not eligible because of his "medium risk score" under a BOP assessment tool used for its home confinement program.  *Id.* at 13; *see also id.* at 22–23.

## II.  ANALYSIS

The First Step Act of 2018 amended numerous provisions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration.  *See* Pub. L. No. 115-391, 132 Stat. 5194; Cong. Research Serv., R45558, *The First Step Act of 2018: An Overview* 1 (2019).  Congress designed the provision at issue here, § 3582(c)(1)(A), for "Increasing the Use and Transparency of Compassionate Release."  § 603(b), 132 Stat. at 5239.  Section 3582(c)(1)(A) allows defendants, for the first time, to petition district courts directly for compassionate release.  *Id.*  Under the old regime, defendants could petition only the BOP Director, who could then make a motion, at his or her discretion, to the district court.  *See* U.S. Sentencing Guidelines Manual § 1B1.13 cmt. n.4 (U.S. Sentencing Comm'n 2018) [hereinafter U.S.S.G.].  The Director rarely did so.  *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).

---

[4] Defendant uses a CPAP machine.  ECF No. 169 at 26.

## A.  *Exhaustion*

The First Step Act's gate-keeping provision created two ways for a defendant to bring a compassionate release motion to a district court.  The defendant may file a motion once he "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier.*"[5]  § 3582(c)(1)(A) (emphasis added).  With this second path, the statute's plain text states only that thirty days must past after the defendant requests compassionate release from the warden.  No more.  *United States v. York*, No. 3:11-CR-76, 2019 WL 3241166, at *5 (E.D. Tenn. July 18, 2019).  Thus, while § 3582(c)(1)(a)'s gate-keeping provision often is described as an "exhaustion" requirement, it is not "an exhaustion requirement in the traditional sense . . . as it allows a defendant to come to court before the agency has rendered a final decision."  *United States v. Haney*, No. 19-CR-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020) (Rakoff, J.).

Here, Defendant has satisfied the statute's gate-keeping provision because thirty days have passed since Defendant filed a petition for compassionate release with his warden.  *See* ECF No. 169 at 12.  Thus, as of May 13, Defendant satisfied the gatekeeping requirement, and the Government makes no argument to the contrary.  The Court may thus address the merits.

## B.  *Extraordinary and Compelling Reasons*

Compassionate release provides a path for defendants with "extraordinary and compelling reasons" to leave prison early.  § 3582(c)(1)(A)(i).  Such a sentence reduction must

---

[5] "Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise. . . ."  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979).  And as in *Reiter*, "here it does not."  *Id.*; *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2130 (2016) (Thomas, J., dissenting).  This is so because the phrase "*whichever* is earlier" makes clear that full exhaustion and "the lapse of 30 days" constitute two distinct paths to federal court.  § 3582(c)(1)(A) (emphasis added).

comply with the 18 U.S.C. § 3553(a) factors and "applicable policy statements issued by the Sentencing Commission."  § 3582(c)(1)(A).

1. Definitions

Congress never defined what constitutes "extraordinary and compelling."  *See* 28 U.S.C. § 994(t).  Instead, the statute directed the Commission to promulgate "the criteria to be applied and a list of specific" extraordinary and compelling examples.  *Id.*  Before the First Step Act, the Commission provided just three such examples, none of which apply here.[6]

The Commission also provided a catch-all provision that allows the BOP Director to determine "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 cmt. n.1(D).  That still begs the question: what is extraordinary and compelling?

Congress and the Commission gave two guideposts.  Extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing."  *Id.* § 1B1.13 cmt. n.2.  For example, just because a judge believes a defendant will dramatically improve himself while incarcerated, that does not mean she cannot deem such improvement extraordinary and compelling.  And although "rehabilitation . . . is not, *by itself*, an extraordinary and compelling reason," its mention by the Commission and Congress indicate rehabilitation may be considered

---

[6] First, the defendant's medical condition is such that he suffers from a "terminal illness" or the condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  U.S.S.G. § 1B1.13 cmt. n.1.

Second, "[t]he defendant (i) is at least [sixty-five] years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least [ten] years or [seventy-five] percent of his or her term of imprisonment, whichever is less."  *Id.*

Third, the defendant's family circumstances include either "(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children" or "(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner."  *Id.*

with other factors.  *See id.* § 1B1.13 cmt. n.3 (emphasis added); § 994(t) ("Rehabilitation of the

defendant alone shall not be considered an extraordinary and compelling reason.").

Courts otherwise are left to themselves because the Commission, for whatever reason,

never updated its policy statement, as statutorily required, for the First Step Act.[7]  Rather, the

outdated policy statement still assumes compassionate release "may be granted only upon motion

by the Director of the Bureau of Prisons."  U.S.S.G. § 1B1.13 cmt. n.4.  This left district courts

in a conundrum.  On the one hand, Congress unequivocally said it wishes to "[i]ncreas[e] the

[u]se . . . of [c]ompassionate [r]elease" by allowing district courts to grant petitions "consistent

with *applicable* policy statements" from the Commission.  § 3582(c)(1)(A) (emphasis added).

On the other hand, the Commission—unable to take any official action—has not made the policy

statement for the old regime applicable to the new one.

Many courts, including this one, have concluded this means the Commission lacks an

applicable policy statement regarding when a court can grant compassionate release.  *United*

*States v. Stephenson*, No. 3:05-CR-00511, 2020 WL 2566760, at *4 (S.D. Iowa May 21, 2020);

*United States v. Haynes*, No. 93 CR 1043 (RJD), 2020 WL 1941478, at *14 (E.D.N.Y. Apr. 22,

2020) (citing thirteen such cases).  In the absence of an applicable policy statement, these courts

conclude "the Court can determine whether any extraordinary and compelling reasons other than

those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)–(C) warrant granting relief."  *Cantu*, 2019

WL 2498923, at *5; *see also United States v. Fox*, No. 2:14-CR-03-DBH, 2019 WL 3046086, at

*3 (D. Me. July 11, 2019) (treating "the previous BOP discretion to identify other extraordinary

---

[7] The Commission cannot amend its guidelines until it again has four voting commissioners.
*United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *1 n.1 (S.D. Tex. June 17, 2019)
(quoting *United States v. Handerhan*, No. 1:10-CR-00298, 2019 WL 1437903, at *1 n.4 (M.D. Pa. Apr. 1,
2019)).  The Commission still has only two voting members.  *About the Commissioners*, U.S. Sentencing
Comm'n, https://www.ussc.gov/commissioners (last visited June 1, 2020).

and compelling reasons as assigned now to the courts"). The result is that the district court can consider anything—or at least anything the BOP could have considered—when assessing a defendant's motion.

The number of courts agreeing Congress gave them broad discretion to find a defendant's reasons extraordinary and compelling has grown more still as society grapples with COVID-19's profound penological consequences. *E.g.*, *Rodriguez*, 2020 WL 1627331, at \*12. Indeed, the Court's reading "appears to be the majority position." *United States v. Scott*, No. 17-CR-156, 2020 WL 2508894, at \*8 (E.D. Wis. May 15, 2020). It also is safe to say Congress is aware of courts' use of the law during the pandemic. *See* Cong. Research Serv., R46297, *Federal Prisoners and COVID-19: Background and Authorities to Grant Release* 9 (2020).

To be sure, some courts and the Government still maintain that the First Step Act merely allows courts to grant a motion for compassionate release if the BOP Director would have done the same under the Sentencing Guidelines and the BOP Program Statement written for the old law. These courts conclude judges may not stray beyond the specific instances listed in § 1B1.13 cmt. n.1 (A)–(C). *E.g.*, *United States v. Lynn*, No. CR 89-0072-WS, 2019 WL 3805349, at \*4 (S.D. Ala. Aug. 13, 2019). They reason that the Sentencing Commission reserved § 1B1.13 cmt. n.1's residual provision for the BOP Director and only the BOP director. *Id.*

The Court's previous interpretations of the statute bind no one, not even itself. Regardless, the Court declines to alter its reading. Courts assume Congress legislates with the full knowledge of how agencies have interpreted earlier versions of a statute. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000) (noting Congress has "effectively ratified the FDA's long-held position"). Congress also can "revoke or amend" the Sentencing Commission's guidelines and policy statements at any time. *United States v.*

8

*Anderson*, 686 F.3d 585, 590 (8th Cir. 2012) (citing *Mistretta v. United States*, 488 U.S. 361, 393–94 (1989)).  The U.S. Supreme Court repeatedly has noted that "'the title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (quoting *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947)).  Although titles are not dispositive, sometimes they can be "especially valuable." *Yates v. United States*, 574 U.S. 528, 552 (2015) (Alito, J., concurring).

Here, Congress knew of the BOP's rare granting of compassionate release petitions.[8] Until 2013, on average, "only [twenty-four] inmates were released each year." *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).  That number increased to eighty-three inmates between August 2013 and September 2014 following complaints to the BOP from the Inspector General's office.  *Id.*  Since Congress still amended the program following this increase, one can infer Congress thought eighty-three was still insufficient.  Because rather than "effectively ratif[ying]" the BOP's position, Congress sought to overturn it by statute.  *Brown & Williamson Tobacco Corp.*, 529 U.S. at 144.

The Act listed these changes under the title of "Increasing the Use and Transparency of Compassionate Release."  § 603(b), 132 Stat. at 5239.  That title is "especially valuable" here. *Yates*, 135 S. Ct. at 1090.  The Court assumes the BOP Director faithfully executes the narrowly drawn policy and program statements related to compassionate release.  Therefore, the only way direct motions to district courts would increase the use of compassionate release is to allow

---

[8] The First Step Act's compassionate release provisions originally appeared as a stand-alone bill. Granting Release and Compassion Effectively Act of 2018, S. 2471, 115th Cong. (2018).  That bill explicitly sought to "improve the compassionate release process of the Bureau of Prisons." *Id.*

district judges to consider the vast variety of reasons that may be "extraordinary and compelling."

The Court acknowledges the policy arguments to the contrary.  Yes, releasing defendants from incarceration is a delicate business—but not any more so than incarcerating them initially. Indeed, Congress and the Supreme Court have long trusted district courts to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 113 (1996).

The Court's reading of the law also does not—and has not—allowed judges to release any prisoner.  The Court recognizes and respects the intricate sentence-adjustment scheme Congress has created.  The Court also knows it must still act in harmony with any sentencing policy guidelines that remain applicable and the § 3553(a) factors.  § 3582(c)(1)(A).  For instance, the need to appropriately punish severe conduct and not introduce sentencing disparities between defendants convicted of similar crimes provide additional limits on a judge's ability to release people from custody.  *See* § 3553(a)(2)–(6).

Therefore, if the First Step Act is to increase the use of compassionate release, the most natural reading of § 3582(c) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it.  Unqualified "deference to the BOP no longer makes sense now that the First Step Act has reduced the BOP's role."  *Fox*, 2019 WL 3046086, at *3.

2.  Defendant's Extraordinary and Compelling Reasons

The number of courts agreeing the COVID-19 pandemic constitutes an extraordinary and compelling reason for release if there ever was one grows by the day.  *E.g.*, *United States v.*

*Moore*, No. 3:16-CR-00171-JO, 2020 WL 2572529 (D. Ore. May 21, 2020); *United States v. Galloway*, No. RDB-10-0775, 2020 WL 2571172 (E.D. Mich. May 21, 2020); *United States v. Parker*, No. 2:98-cr-00749, 2020 WL 2572525 (C.D. Cal. May 21, 2020*); United States v. Schneider*, No. 14-CR-30036, 2020 WL 2556354, at *1 (C.D. Ill. May 20, 2020); *United States v. Hill*, No. 3:19-cr-00038 (JAM), 2020 WL 2542725 (D. Conn. May 19, 2020); *United States v. Bright*, No. 2:15CR00015-005, 2020 WL 2537508 (W.D. Va. May 19, 2020); *United States v. Bischoff*, No. 17-cr-196-JD, 2020 WL 2561423 (D.N.H. May 18, 2020); *United States v. Cotinola*, No. 13-CR-03890-MV, 2020 WL 2526717, at *3 (D.N.M. May 18, 2020); *United States v. Rountree*, No. 1:12-CR-0308 (LEK), 2020 WL 2610923 (N.D.N.Y. May 18, 2020); *United States v. Johnson*, No. 15-cr-125 (KBJ), 2020 WL 2515856 (D.D.C. May 16, 2020); *United States v. Bess*, No. 16-CR-156, 2020 WL 1940809, at *9 (W.D.N.Y. Apr. 22, 2020); *United States v. Smith*, No. 12 CR. 133 (JFK), 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13, 2020); *United States v. Hernandez*, No. 18 CR. 834-04 (PAE), 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020); *Rodriguez*, 2020 WL 1627331, at *1; *United States v. Jepsen*, No. 3:19-CV-00073(VLB), 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020); *United States v. Campagna*, No. 16 CR. 78-01 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020).

Numerous courts also have held release particularly is justified when the prisoner suffers from preexisting health conditions that might make a COVID-19 infection more lethal.  Asthma is one such condition.  *E.g.*, *United States v. Gorai*, No. 218CR220JCMCWH, 2020 WL 1975372, at *3 (D. Nev. Apr. 24, 2020) ("The court finds that defendant's asthma falls squarely within the ambit of preexisting conditions that the [Centers for Disease Control and Prevention (CDC) have] unambiguously explained place him at greater risk of COVID-19."); *see also United States v. Park*, No. 16-CR-473 (RA), 2020 WL 1970603, at *3 (S.D.N.Y. Apr. 24, 2020)

(noting that, according to the CDC, "people with ailments that cause trouble breathing, particularly asthma, . . . are at a significantly higher risk").

No one disputes Defendant has had asthma for years.  *See* ECF No. 173 at 5; ECF No. 169 at 29; *see also* ECF No. 176 at 1–2.  Medical records submitted by Defendant confirm the diagnosis, show he uses two inhalers, and list spells of shortness of breath.  ECF 169 at 31, 35.  These records also show Defendant uses a CPAP machine to assist with breathing.  *Id.* at 26.  To be sure, Defendant's medical records suggest the BOP certainly knows how to treat these breathing conditions.  Yet that misses the point.  The Court's concern, rather, is that Defendant's preexisting medical conditions create an untenable risk of death should Defendant contract a lethal, easily spread virus for which "there is no known cure, no effective treatment, and no vaccine."  *S. Bay United Pentecostal Church*, 2020 WL 2813056, at *1 (Roberts, C.J., concurring).

The case for release becomes more compelling, still, for a defendant with a small fraction of his sentence left.  *United States v. Perez*, No. 17 CR. 513-3 (AT), 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020).  This is so because "[t]he benefits of keeping him in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave."  *Id.*  Defendant has been in custody since January 24, 2011, has a projected release date of November 4, 2023, and is likely to be in a halfway house by the end of 2022.  ECF No. 172 at 15.  That is more than 73% of his sentence, including good time credits.  *Id.*  The BOP, for instance, only requires a Defendant serve half of his sentence before considering him for home confinement, suggesting much of the penological interest can be served by that point.  ECF No. 169 at 22.

The Government notes there indeed are far fewer infections among federal prisoners than Americans at large.  ECF No. 173 at 9.  There also are far fewer Americans inside federal prisons than outside of them.  Accounting for that discrepancy, the former category is much more likely to have had a confirmed case of the virus, even with BOP's limited testing.[9]  And although FCI Allenwood Low does not have a confirmed, open case, that fact does not provide much assurance in the current environment.[10]  *See Moore*, 2020 WL 2572529, at *2 ("Some BOP facilities have seen [outbreaks] grow into hundreds of confirmed cases in a matter of weeks.").  For the foregoing reasons, Defendant's specific vulnerability to a deadly case of COVID-19 and the relatively little time left on his sentence constitute extraordinary and compelling reasons supporting compassionate release.[11]

## C.  *§ 3553(a) Factors*

Finally, the Court must consider if compassionate release comports with any applicable § 3553(a) factors.  § 3582(c)(1)(A).  The Court's lodestar in such analyses is to ensure the sentence is "sufficient, but not greater than necessary."  § 3553(a).  In Defendant's case, the "nature and circumstances of the offense"—selling drugs—are serious.  § 3553(a)(1).  But the Court also must consider the offense conduct that led to Defendant receiving such a severe

---

[9] There are at least 1629 "open" cases, 3605 recovered cases, and 67 deaths among 148,265 federal prisoners in BOP and community facilities, representing **3.58%** of the BOP population.  *COVID-19 Cases*, Fed. Bureau Prisons (June 1, 2020), https://www.bop.gov/coronavirus/.  There have been at least 1,790,172 confirmed cases among roughly 329,721,848 Americans, representing **0.54%** of the population.  *Compare Mortality Analysis*, Johns Hopkins U. & Med. (May 31, 2020, 11:45 PM), https://coronavirus.jhu.edu/data/mortality, *with U.S. and World Population Clock*, U.S. Census Bureau, https://www.census.gov/popclock/ (last visited June 1, 2020).

[10] Indeed, Defendant's filings demonstrate how easily viruses can spread through Allenwood Low.  In January 2020, Defendant asked prison administrators what they were doing about a gastrointestinal virus that, apparently, was causing inmates to experience diarrhea before reaching the bathroom.  *See* ECF No. 169 at 24.  Administrators responded they were continuing "to work with local and regional experts in evaluating our plan to address the GI [sy]mptoms that we are experiencing."  *Id.*

[11] The Court does not hold that every federal inmate can now seek compassionate release simply because of the COVID-19 pandemic.  For instance, consideration of the § 3553(a) factors may still bar release.  *United States v. Starr*, No. 4:06-CR-00080, 2020 WL 2312045, at *1 (S.D. Iowa May 8, 2020).

sentence.  Defendant faced a ten-year mandatory minimum because his record contained two prior drug felonies.  *See* ECF No. 84.  Yet each of those felonies involved Defendant possessing or delivering *less than a gram* of cocaine.  ECF No. 146 ¶¶ 36, 38.  In the Court's experience, those are unusually low amounts to trigger 21 U.S.C. § 841(b)(1)(B)'s harsh ten-year mandatory minimum.  Congress appeared to agree by passing the First Step Act, which amended § 841 such that only a "serious" drug felony, not just any felony involving drugs, could trigger the mandatory minimum.  § 401, 132 Stat. at 5220–21.  As the Court has noted previously, it is not clear either offense would qualify as a "serious drug felony" under the modern version of 21 U.S.C. § 841(b)(1)(B).  ECF No. 165 at 2.

With respect to "characteristics of the defendant," § 3553(a)(1), the Court must assess Defendant as a whole person.  *Koon*, 518 U.S. at 113.  Clearly, this was not Defendant's first conviction, *see* ECF No. 146 ¶¶ 34–42, but these prior drug and property crimes occurred in his twenties.  *See id.* ¶¶ 34–42.  Defendant now is forty-five years old, making him about half as likely to be convicted of a crime as a defendant released in his twenties.  U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 23 (2017).  The Court also must consider Defendant's criminal history in the context of his deeply troubled upbringing.  He lacked parental guidance between an absent father and a sporadically involved mother with a drug addiction.  ECF No. 146 ¶ 66.  As the USPO put it, "[h]is neighborhood was plagued by gangs, drugs, and violence."  *Id.*  Although Defendant apparently joined one of those gangs at a young age, he also voluntarily left that gang, showing an ability to change.  *Id.*

Regardless, the "need for the sentence imposed" appears weaker after nearly a decade of incarceration.  § 3553(a)(2).  Defendant likely has served what Congress determined to be the minimum punishment for his conduct.  This is so because assuming without deciding

§ 841(b)(1)(B)'s ten-year mandatory minimum would apply to Defendant under modern law, it likely would have been satisfied by now.  Defendant has been in custody since January 24, 2011.  ECF No. 172 at 15.  Although that is only nine years and four months in calendar days, the FPD represents that when accounting for good-time credits, Defendant, in practice has served about eleven years.  ECF No. 172 at 16.  The Government offers no rebuttal on this point.

Given the nature of Defendant's convictions and non-violent behavior in prison, incarceration is not necessary "to protect the public from further crimes of the defendant." § 3553(a)(2)(C).  The BOP placed Defendant at a low-security facility, and Defendant, apparently, is now eligible for transfer to a minimum-security facility.  ECF No. 172 at 15.

Meanwhile, Defendant's use of prison programming and employment suggests an actual vocation—outside of prison—would best "provide the defendant with needed educational or vocational training."  § 3553(a)(2)(D).  In his petition to his Warden, Defendant notes that his father, who lives in the Chicago area and with whom Defendant has reconnected, has found a job for him when the economy reopens.  ECF No. 169 at 20; ECF No. 146 ¶ 67.

Nor is incarceration the only "kind[] of sentence available."  § 3553(a)(3).  Noncustodial sentences also curtail "prized liberty interests" and "the Defendant always faces the harsh consequences that await if he violates the conditions" attached to such a sentence.  *United States v. Gall*, 374 F. Supp. 2d 758, 763 (S.D. Iowa 2005), *rev'd*, 446 F.3d 884 (8th Cir. 2006), *rev'd*, 552 U.S. 38 (2007).  Such restrictions also promote respect for the law, protect the public, and do not constitute any endorsement of Defendant's conduct.  *See id.*

Although it is true the Sentencing Commission's Guidelines counseled in favor of a longer sentence, they are but one factor.  *See* § 3553(a)(4).  Furthermore, the fact Defendant has, in-effect, satisfied the ten-year mandatory minimum sentence for his offense means his release

will not create a drastic sentencing disparity with defendants "who have been found guilty of similar conduct." § 3553(a)(6). The Court would have been well within its discretion to sentence Defendant to ten years. Had it known the twilight of Defendant's sentence would involve incarceration during a global pandemic that has proven particularly dangerous in prisons, it would have done so.

A court's decision does not cease to be an "exercise of reason simply because it is also an exercise of compassion." *United States v. Likens*, 464 F.3d 823, 827 (8th Cir. 2006) (Bright, J., dissenting), *cited with approval in Gall*, 552 U.S. at 52 n.7. The Court grants Defendant's Motion for compassionate release because it is supported by extraordinary and compelling reasons as well as the § 3553(a) factors.

### D.  *Release Plan*

Defendant's term of imprisonment is reduced to time served, and he is sentenced to a term of supervised release that runs until his current release date plus the eight-year term imposed at sentencing. The term of supervision is subject to conditions in the original judgment. In addition, Defendant shall reside at the home of his grandmother, which he listed at 1503 W. 114th Place, Chicago, Illinois. The USPO must approve any address change. Jurisdiction is thus transferred to the Northern District of Illinois, should it be accepted, pursuant to 18 U.S.C. § 3605.

Upon release, Defendant shall contact the Northern District of Illinois USPO within seventy-two hours. He shall submit to USPO screening for COVID-19 following his release to the extent it is available. He shall comply with national, state, and local orders regarding COVID-19.

### III.  CONCLUSION

For the reasons stated herein, Defendant's pro se Motion for Compassionate Release (ECF No. 169) is GRANTED.

IT IS SO ORDERED.

Dated this 2nd day of June 2020.

ROBERT W. PRATT, Judge
U.S. DISTRICT COURT